# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

STEVEN PETERSON,

    Plaintiff,

vs.

MARTIN MARIETTA MATERIALS,
INC.; JEFF BALDWIN; and STACY
OLBERDING, individually and in their
corporate capacities,

    Defendants.

No. C14-3059-LTS

**ORDER ON DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

---

## I. INTRODUCTION

This case is before me on defendants' motion (Doc. No. 25) for summary judgment. Plaintiff has filed a resistance (Doc. No. 33) and defendants have filed a reply (Doc. No. 42). While the parties have requested oral argument, the issues have been thoroughly briefed such that I do not find oral argument to be necessary. *See* N.D. Ia. L.R. 7(c). The motion is fully submitted and ready for decision.

## II. PROCEDURAL HISTORY

Plaintiff Steven Peterson (Peterson) commenced this action on September 30, 2014, by filing a four-count petition (Doc. No. 3) in the Iowa District Court for Worth County. The named defendants are Martin Marietta Materials, Inc. (Martin), along with Jeff Baldwin (Baldwin) and Stacy Olberding (Olberding), both individually and in their corporate capacities. Counts I and II assert disability discrimination in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and the Iowa Civil Rights Act (ICRA), Iowa Code Chapter 216. Count III alleges retaliation due to Peterson's opposition to discrimination in the workplace in violation of "42 U.S.C. §

2000 *et seq.*"[1] and the ICRA. Count IV alleges retaliation in violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 et. seq. All counts appear to be asserted against all defendants. Doc. No. 3 at 8-11.

On September 30, 2014, defendants filed a notice (Doc. No. 2) of removal to this court. They then filed an answer (Doc. No. 5) in which they deny liability and assert various defenses. The case was reassigned to me on February 11, 2016. Discovery is now closed and trial is scheduled to begin June 20, 2016. *See* Doc. No. 31.

Defendants filed their motion for summary judgment on February 1, 2016, seeking judgment in their favor on all counts. In his resistance, Peterson narrowed his claims by abandoning any disability discrimination claims other than discriminatory termination of employment. Doc. No. 33-8 at 11. Thus, his other allegations of discrimination, in the form of harassment, failure to accommodate and retaliation, are no longer part of this case. *Id.* This leaves for disposition only Peterson's claims that he was discharged (a) due to his alleged disability in violation of the ADA and the ICRA and (b) in retaliation for exercising rights under the FMLA.

## III. UNDISPUTED FACTS

Except as otherwise noted, the following facts are undisputed for purposes of defendants' motion:[2]

Peterson's employment with Martin began April 11, 2005. He held an at-will position as a truck driver. During his employment, he volunteered for and assumed the role of safety captain. Each crew had a safety captain to serve as a liaison between the

---

[1] The United States Code contains no section designated as 42 U.S.C. § 2000. I assume the retaliation claim set forth in Count 3 is based on Title VII of the Civil Rights Act of 1964, which is codified as 42 U.S.C. § 2000e *et seq*.

[2] I will not include facts that appear to bear entirely on those claims Peterson has elected to abandon.

hourly employees and management team. Although the safety captain had added responsibilities, the position did not include an increase in pay.

Peterson was diagnosed with three medical conditions while employed at Martin. In 2008, he was diagnosed with Hepatitis C. In 2010, after experiencing a stroke, he was diagnosed with a thyroid condition. In 2011, he was diagnosed with cirrhosis of the liver. According to Peterson, these conditions caused him to become tired and worn down easily.

On November 29, 2010, Peterson missed work because of his stroke. He completed the necessary paperwork to request leave under Martin's Sickness and Accident (S&A) Leave Policy, as well as under the FMLA. The requested leave was granted. On March 2, 2011, Peterson returned to work with no restrictions.

In late 2011 or early 2012, Peterson again requested and was granted S&A and FMLA leave. During Peterson's absence, Martin hired additional employees and another employee, Troy White, assumed the duties of safety captain. White was employed in the same position as Peterson and had previously served as a safety captain.

On April 30, 2012, Peterson returned to work, again without restrictions. The parties dispute whether Peterson was assigned to the same crew or, alternatively, if he was assigned to the same positon. Peterson contends that upon his return, he was assigned work that involved more difficult manual labor than his previous work assignment. Peterson also contends that he had not been moved among different locations prior to taking FMLA leave but was moved twice after returning from leave. Additionally, Peterson continued in his previous duties as safety captain with White also operating as safety captain. At some point, however, White assumed sole responsibility of the safety captain duties. Peterson was allowed to work overtime upon his return from FMLA leave.

The parties also dispute whether the defendants knew about Peterson's Hepatitis C. Peterson contends that he informed both Baldwin and Olberding, but both parties deny having such knowledge. Additionally, the parties dispute whether Peterson asked for any accommodations. Peterson contends that he asked to be provided a specific location to administer medication, to be allowed a lunch break to take medication and to be allowed bathroom usage due to his frequent urination. Defendants deny Peterson made any of these requests.

On August 6, 2012, due to an increase in property damage incidents, Martin held a company-wide "safety stand down" that included mandatory safety meetings. Peterson attended those meetings. The next day, Peterson was involved in an incident causing property damage. Specifically, Peterson backed a skid loader into a truck he had recently parked. Martin investigated the incident and issued a Root Cause Analysis incident report. Martin also provided Peterson with written notice that further damage could result in discipline, including termination.

On November 9, 2012, Peterson was involved in another accident causing property damage. Martin conducted an investigation and, ten days later, terminated Peterson's employment.

## IV.    SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id*. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id*.

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods,* 415 F.3d 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the

burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

No unique summary judgment standards apply to employment discrimination cases. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-43 (8th Cir. 2011) (en banc) (rejecting prior decisions that applied a "discrimination case exception" to the analysis of summary judgment motions). However, as Judge Bennett has aptly explained, applying summary judgment standards to the motivation-intensive elements present in most employment discrimination cases is not a simple task:

> Employment discrimination and retaliation, except in the rarest cases, are difficult to prove. They are perhaps more difficult to prove today—fifty years after the passage of the EPA, more than forty years after the passage of Title VII and the ADEA, more than twenty years after the passage of the ADA, and nearly two decades after the passage of the FMLA—than during the earlier evolution of these anti-discrimination and anti-retaliation statutes. Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor leave a well-developed trail demonstrating it. *See, e.g., Riordan v. Kempiners*, 831 F.2d 690, 697–98 (7th Cir. 1987). Indeed, the Fifth Circuit Court of Appeals recognized more than thirty-five years ago, that "[a]s patently discriminatory practices become outlawed, those employers bent on pursuing a general policy declared illegal by Congressional mandate will undoubtedly devise more sophisticated methods to perpetuate

discrimination among employees." *Rogers v. EEOC*, 454 F.2d 234, 239 (5th Cir. 1971) (later relied on by the Supreme Court in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–67 (1986), as one of the principal authorities supporting recognition of a cause of action for hostile environment sexual harassment under Title VII).

My experience suggests the truth of that observation. Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination and retaliation cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true, because the very best workers are seldom employment discrimination and retaliation plaintiffs due to sheer economics: Because the economic costs to the employer for discrimination or retaliation are proportional to the caliber of the employee, discrimination or retaliation against the best employees is the least cost effective. *See, e.g., id.* Rather, discrimination and retaliation plaintiffs tend to be those average or below-average workers—equally protected by Title VII, the ADA, the ADEA, the EPA, or the FMLA—for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g., id.* On the other hand, it is also relatively easy for disgruntled former employees to claim a protected basis under federal and state anti-discrimination laws as a reason for their discharge when in fact they played no part. This is true even when the former employee and/or their counsel believe they did. This is what makes deciding these issues on a paper record daunting.

*Pick v. City of Remsen,* No. C13-4041, 2014 WL 4258738, at *12 (N.D. Iowa Aug. 27, 2014). While the task can indeed be daunting in an employment discrimination case, "the focus of inquiry at the summary judgment stage 'always remains on the ultimate question of law: whether the evidence is sufficient to create a genuine issue of fact as to whether the employer intentionally discriminated against the plaintiff because of [the protected characteristic].'" *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1018 (8th Cir. 2005) (quoting *Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328, 1336-37 (8th Cir. 1996)).

## V.    ANALYSIS

As noted above, Peterson's remaining claims are (1) discriminatory discharge in violation of the ADA and the ICRA and (2) discharge in retaliation for exercising FMLA rights.    I will address those theories separately.[3]

### A.    Disability Discrimination

Peterson argues that his employment was terminated due to his disability. Defendants argue that Peterson was discharged for a legitimate, non-discriminatory reason; namely his involvement in two incidents causing property damage shortly after a company-wide safety stand down.

#### 1.    Applicable Law

In general, claims of disability discrimination are analyzed identically under the ADA and the ICRA.    *See Kallail v. Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925, 930 (8th Cir. 2012).    Except with regard to the causation standard, which I will address below, Peterson does not argue otherwise.

A plaintiff can demonstrate discrimination with direct evidence or by raising an inference of discrimination through the *McDonnell Douglas*[4] burden-shifting framework. *See St. Martin v. City of St. Paul*, 680 F.3d 1027, 1033 (8th Cir. 2012).    Because Peterson does not claim to have direct evidence of discrimination, I will analyze his disability discrimination claim under the *McDonnell Douglas* framework.    The first step is to consider whether Peterson has established a prima facie case of discrimination.    *See*

---

[3] While there may be legitimate arguments that the individual defendants are not proper parties to Peterson's remaining claims, defendants have not raised any such arguments.    Instead, they contend that all claims must be dismissed as against all defendants as a matter of law.    Because defendants have not raised the issue of individual liability, I will not address it.

[4] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*Olsen v. Capital Region Med. Center*, 713 F.3d 1149, 1153 (8th Cir. 2013); *Casey's Gen. Stores, Inc. v. Blackford*, 661 N.W.2d 515, 519–20 (Iowa 2003). To establish a prima facie case, the plaintiff must show he (1) had a disability within the meaning of the relevant statute, (2) was qualified to perform the essential functions of his job with or without reasonable accommodation and (3) suffered an adverse employment action because of his disability. *Hansen v. Seabee, Corp.*, 688 N.W.2d 234, 238 (Iowa 2004) (analyzing ADA claim and citing *Kincaid v. City of Omaha*, 378 F.3d 799, 804 (8th Cir. 2004)); *Casey's Gen. Stores*, 661 N.W.2d at 519–20 (stating identical elements of ICRA disability discrimination claim).

If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for discharge. *St. Martin*, 680 F.3d at 1033. If the employer advances such a nondiscriminatory reason, the presumption of discrimination disappears and the plaintiff bears the burden of demonstrating that the employer's proffered reason is merely a pretext for intentional discrimination. *Id.*

### 2. Discussion

#### a. The Prima Facie Case

##### i. Disability

Peterson asserts that his condition of Hepatitis C qualified as a disability for purposes of the first element of his prima facie case. The ADA defines disability to include, among other things, "a physical or mental impairment that substantially limits one or more major life activities of [an] individual." 42 U.S.C. § 12102(1). Major life activities include, but are not limited to "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Major life activities also include major bodily functions, as

defined by the ADA.   *Scheffler v. Dohman*, 785 F.3d 1260, 1261 (8th Cir. 2015) (citing 42 U.S.C. § 12102(2)).   Major bodily functions are, among other things, "functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."   42 U.S.C. § 12102(2)(B).

In determining whether an impairment "substantially limits" a major life activity, the applicable regulations state:

> An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

29 C.F.R. § 1630.2(j)(1)(ii).   Thus, a diagnosis of Hepatitis C does not automatically demonstrate that Peterson had a disability while employed at Martin.   *Kirkeberg v. Canadian Pacific Ry.*, 619 F.3d 898, 903 (8th Cir. 2010).   Instead, I must determine whether Peterson has submitted evidence that would allow a jury to find that this condition substantially limited one or more of his major life activities.

Peterson testified that he suffers from Hepatitis C, a thyroid condition and cirrhosis of the liver and that he was working for Martin when Hepatitis was diagnosed with these conditions.   Doc. No. 33-5 at 10.   He further testified that he does not consider any of these conditions to be a disability.   *Id.* at 11-12.   When asked if Hepatitis causes him to have a physical disability, Peterson answered:

> I don't feel I do.   . . .   But I get tired easy sometimes.   You know, I have good days and bad days, you know, but my arms and legs, everything works.   And I work full-time, so I don't think I do.

*Id.* at 12.    Peterson testified that his physical issues while employed by Martin were the same as they were as of the date of his deposition.    *Id.*    However, he did note that he suffered periodic episodes of nausea and bleeding due to interferon treatments that occurred between September 2011 and October 2012.    *Id.*

Peterson testified that he told several Martin employees, including defendants Baldwin and Olberding, about his interferon treatments and his issues with nausea.    *Id.* at 13.    He also testified that he did not believe these issues interfered with his ability to do his job.    *Id.*    He explained that when he returned from his second FMLA leave, Baldwin asked him if he was "100 percent" and Peterson answered affirmatively because he felt "100 percent."    *Id.* at 15.

In light of this record, the evidence that Peterson had a disability while employed by Martin is extremely light.    He did, however, testify that his interferon treatments sometimes caused him to soil or wet himself and that this occurred two times while he was on the job.    *Id.* at 45.    Because digestive and bladder functions are major bodily functions that affect major life activities, I am unable to find, as a matter of law, that Peterson did not have a disability within the meaning of the ADA and ICRA.

### ii.    *Qualified to perform the essential functions of the job*

Peterson contends that he was able to perform the essential functions of his job, but was denied reasonable accommodations.    Defendants argue that Peterson was not able to maintain safety standards and therefore was not able to perform an essential function of the job.

"To succeed on a disability-discrimination claim under the ADA, a claimant must show that he was a 'qualified individual' who suffered 'discrimination' that was based on a 'disability' as each of those terms is defined by the Act."    *Morriss v. BNSF Ry. Co.*, ___ F.3d ___, No. 14-3858, 2016 WL 1319407, at *2 (8th Cir. Apr. 5, 2016) (citing

*Brown v. City of Jacksonville*, 711 F.3d 883, 888 (8th Cir. 2013)). A qualified individual under the ADA and ICRA is an employee who must "(1) possess the requisite skill, education, experience, and training for [the] position, and (2) be able to perform the essential job functions, with or without reasonable accommodation." *Scruggs v. Pulaski County, Ark.*, ___ F.3d ___, No. 15-1248, 2016 WL 1274119, at *2 (8th Cir. Apr. 1, 2016) (citing *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013) (quotation omitted)); *see also Goodpaster*, 849 N.W.2d at 14 (stating identical requirements under the ICRA). Essential job functions are those considered fundamental to the position. *Id.* The Eighth Circuit Court of Appeals has explained:

> A job function may be essential if the reason the position exists is to perform that function, or if a limited number of employees are available among whom the performance of the job function can be distributed. In determining whether a job function is essential, we consider evidence including what functions the employer thinks are essential, written job descriptions, how much time an employee spends on the job performing the function, the consequences of not having the employee perform the function, and whether other current employees in similar jobs perform the function.

*Id.* (citations omitted).

In arguing that the ability to maintain safety standards was an essential function of Peterson's job, defendants point out that Martin held a company-wide safety meeting on August 6, 2012, to address the high incidence of property damage accidents. Doc. No. 25-3 at 23-24. Additionally, Martin investigated each property damage incident by preparing a root cause analysis report. *Id.* at 132. Jon Ewing, a former co-worker of Peterson's at Martin, testified that management took safety very seriously. Doc. 25-3 at 42-43. When Peterson was hired, he was presented with a manual and signed an acknowledgement stating: "I [ ] understand that I am expected to comply with the safe working practices contained herein, and that violations of safety rules and regulations are cause for disciplinary action, up to, and including termination. I understand these rules

and regulations are not all inclusive, more specific safety rules and regulations will be provided during task training." Doc. No. 25-3 at 62.

Martin's manual outlined the company's safety rules and expectations and stated: "Willful violation of safe procedures is a cause for disciplinary action up to and including termination." Doc. No. 25-3 at 119. The manual also required employees to report all incidents, injuries and property damage immediately. *Id.* Based on this evidence, Martin argues that maintaining safety standards was an essential part of Peterson's job at Martin.

Peterson disagrees, noting that the written job description for his position did not include language concerning the ability to maintain safety standards. Doc. No. 33-7 at 20. Likewise, the standard form Martin used to determine whether an employee could return to work following medical leave did not include word "safety" within the section that described essential job functions. *Id.* However, that form did list safety-related tasks, such as inspecting the vehicle daily, pre-operational checks of equipment, observing visual and auditory signals during vehicle operation and location identification, observing surrounding vehicle traffic and communicating with coworkers regarding movement of vehicles. *Id.* I find no merit to Peterson's argument that an ability to maintain safety practices was not an essential duty of his position.

At the same time, however, I am unable to find as a matter of law that Peterson was not qualified to perform this essential duty. The fact that Peterson was involved in two property damage accidents does not conclusively demonstrate that Peterson was unqualified to follow safety practices. While defendants argue that Peterson was not meeting his employer's legitimate expectations, the Eighth Circuit has rejected that standard. *See Riley v. Lance, Inc.*, 518 F.3d 996, 1000 (8th Cir. 2008). In *Riley*, the court held that the district court erred in requiring such a showing, explaining instead that the plaintiff was required to show only that he was "otherwise qualified" for the

position he held. *Id.* Here, Peterson held his position with Martin for over seven years. The fact that he had two accidents causing property damage over a period of about three months in 2012 may constitute a legitimate, non-discriminatory reason for discharge (an issue I will address below). However, that fact does not demonstrate that Peterson was not qualified for the position. Defendants have not shown, as a matter of law, that Peterson is unable to satisfy the second element of his prima facie case.

### iii.    *Adverse employment action because of disability*

There is no dispute that Peterson suffered an adverse employment action (discharge). To support his argument that this action occurred because of his disability, Peterson relies on comparator evidence. Specifically, he contends that a non-disabled employee engaged in similar conduct but was not discharged. According to Peterson, this evidence is sufficient to support the third prong of his prima facie case.

Because Peterson also relies on comparator evidence (and other arguments) in support of his claim that Martin's stated reason for discharge is pretextual, I find it appropriate to skip this prong of the prima facie analysis. Instead, I will assume that Peterson has made a prima facie showing of disability discrimination and will move on to the next steps of the analysis.

### b.    *The Nondiscriminatory Explanation*

If Peterson can establish all three prongs of his prima facie case, the burden would shift to the defendants to provide a legitimate, nondiscriminatory reason for discharge. They allege that Peterson was discharged "because he violated company policy to ensure a safe work environment." Doc. No. 25-1 at 12. Specifically, they state:

> Mr. Peterson had been found to be responsible for two incidents within a three month period, he was solely responsible for both incidents, both incidents occurred only a short time after a company wide stand down, and

he refused to take responsibility for his actions. These facts are wholly inconsistent with Martin Marietta's policies and responsibilities regarding safety in the work place.

*Id.* This explanation satisfies the second step of the *McDonnell Douglas* framework.

### c.    Pretext

As noted above, once the employer advances a nondiscriminatory reason for discharge, the presumption of discrimination disappears and the plaintiff bears the burden of demonstrating that the employer's proffered reason is merely a pretext for intentional discrimination. *St. Martin*, 680 F.3d at 1033. Peterson must present evidence that would allow a finding that the reason offered by defendants is not correct and that the defendants acted with the intent to discriminate. *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1003 (8th Cir. 2012). However, "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000)).

Pretext can be demonstrated in several ways, including showing "that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 904 (8th Cir. 2015) (quoting *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010)). Here, Peterson contends that he has produced evidence of all three categories sufficient to raise genuine issues of material fact as to whether the defendants' stated reason for discharge is pretextual.

### i.    *Failure to follow policy*

Peterson alleges Martin failed to follow its own policies. He notes Baldwin's testimony that Martin's standard progressive discipline policy includes the following

steps: (a) oral warning, (b) written warning, (c) suspension and (d) discharge. *See* Doc. No. 33-4 at 13. He also points out that Martin did not follow all of these steps, instead discharging him after his second accident. However, Baldwin also testified that suspension or discharge could occur "depending on the type and severity of the accident." *Id.* Similarly, Olberding testified that Martin does not "have a definite policy that says you have to do this, this, this, this." *Id.* at 74. While agreeing that Martin has four levels of discipline, she stated: "But that doesn't necessarily mean we have to go in that order. We go case by case." *Id.*

Peterson has presented no evidence suggesting that Martin's disciplinary policy was as rigid and inflexible as he suggests. Moreover, after his August 7, 2012, accident, Peterson was warned in writing that his failure to correct the practices causing that accident could result in "[f]urther disciplinary action up to and including termination." Doc. No. 25-3 at 131. This warning adds further support to Martin's position that its policy permitted progressive discipline steps to be skipped depending on the circumstances at issue. I find that Peterson has failed to demonstrate pretext in the form of a failure on Martin's part to follow its own policies.

### ii. *Similarly situated employees*

An employee may demonstrate pretext by showing he or she was treated more harshly than similarly situated employees. *See McNary v. Schreiber -Foods, Inc.*, 535 F.3d 765, 770 (8th Cir. 2008) (citing *Sherman v. Runyon*, 235 F.3d 406, 409 (8th Cir. 2000)). The claimant has the burden to show that the other employees were similarly situated in all relevant respects. *Id.* The test is rigorous. *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008). To be similarly situated, the other employees must have dealt with the same supervisor, have been subject to the same standards and

engaged in the same conduct without any mitigating or distinguishing circumstances. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 796 (8th Cir. 2011).

Peterson alleges Mike Carlberg was a similarly situated, nondisabled employee who was treated more favorably. He presents evidence that he and Carlberg worked at Martin at the same time and held generally-equivalent positions. However, their respective employment terms and experience levels differed greatly. Carlberg testified that he worked for Martin for 30 years. Doc. No. 33-4 at 29. Peterson, as noted above, had worked for Martin for only seven years prior to his discharge. Doc. No. 33-5 at 23. Employees who have significantly different levels of longevity and experience are not similarly situated in all relevant respects. *Fields*, 520 F.3d at 864.

Moreover, while Peterson has produced evidence suggesting that his accidents shared some characteristics with Carlberg's, he has not shown that the events were similarly situated in all relevant respects. Like Peterson, Carlberg testified that he was involved in two separate vehicle incidents while backing up. Doc. No. 33-4 at 30. However, while Peterson was determined to be solely at fault for both of his accidents, Carlberg stated that he and another party shared fault in one of his incidents. Doc. No. 25-3 at 125-27, 132-35; Doc. No. 33-4 at 30. Mark Johnson, a Martin manager, testified that of Carlberg's two incidents, one involved him backing into someone and the other involved Carlberg being backed into. Doc. No. 33-4 at 56. Defendant Baldwin likewise testified that one of Carlberg's incidents involved someone backing into him. *Id*. at 24.

The respective pairs of incidents also occurred over different timeframes. Johnson testified that Carlberg's incidents occurred in 2011 and 2012 but was unable to recall the amount of time between the two incidents. *Id*. at 56. Carlberg was likewise unsure, but guessed that it was one year. *Id*. at 30. According to Baldwin, Carlberg's

accidents occurred within a 12-month period. *Id.* at 24. There is no evidence that Carlberg's accidents occurred less than three months apart, as did Peterson's.

Finally, it is undisputed that both of Peterson's accidents occurred shortly after a company-wide safety stand down, during which all employees were required to attend safety meetings in order to address an increase in property damage incidents. Indeed, his first accident occurred one day after this safety event. Thus, and unlike Carlberg, Peterson was involved in two property-damage accidents almost immediately after Martin undertook a specific emphasis on avoiding such accidents. For all of these reasons, I find that Peterson has failed to demonstrate pretext by showing that a similarly situated nondisabled employee received more favorable treatment.

### iii.    *Shifting explanations*

Finally, Peterson claims the defendants have changed their explanation for terminating his employment. In support, he points to email messages between various Martin management employees. However, those messages show only that there was internal discussion as to the extent of discipline to impose, not as to the reason for imposing discipline. Specifically, some Martin managers proposed a three-day suspension, rather than discharge, after the second accident. Doc. No. 33-7 at 22-24. None of the communications suggest any alternative explanation as to *why* Peterson should be disciplined. Indeed, the email messages at issue expressly reference the fact that Peterson had caused two property damage accidents in a matter of three months. *Id.* Peterson points to no evidence indicating that Martin provided one reason for discipline at one point but later provided a different explanation. As such, I find Peterson has failed to demonstrate pretext by showing that the defendants' proffered reason for discharge shifted over time.

#### d.     *Summary – Disability Discrimination*

I conclude that even if Peterson is able to establish a prima facie case, he has failed to come forward with evidence raising any material issues of disputed fact as to whether the defendants' stated, nondiscriminatory reason for discharge is pretextual. As such, I find that the defendants are entitled to summary judgment on Peterson's claims of disability discrimination under the ADA and the ICRA.[5]

### B.     *FMLA Retaliation Claim*

Peterson argues that he was discharged in retaliation for taking FMLA leave. Defendants maintain, as discussed above, that he was discharged for violating the company's safety policy, thereby causing two property damage incidents shortly after a company-wide safety stand down.

#### 1.     *Applicable Standards*

The FMLA entitles eligible employees to take a total of 12 weeks of leave during a 12-month period due to a serious health condition. *Thorneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005). Employers may not discharge or otherwise discriminate against any individual for asserting rights under the FMLA. 29 U.S.C. § 2615(a)(2). Three types of FMLA claims exist: (1) entitlement claims, (2) discrimination claims and (3) retaliation claims. *Brown v. Diversified Dist. Systems,*

---

[5] Peterson suggests that he has, at minimum, presented a viable claim under the ICRA because the Iowa Supreme Court applies a less onerous standard of causation to ICRA claims. Doc. No. 33-8 at 22 (citing *Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 13 (Iowa 2009), for the proposition that the plaintiff's protected classification need only be a "motivating factor," not the "determining factor," in the adverse employment decision). While *DeBoom* does, in fact, adopt a "motivating factor" causation standard for ICRA claims, I find that the distinction makes no difference here. Peterson has come forward with no evidence from which reasonable jurors could find that his disability was a motivating factor in the discharge decision.

*LLC*, 801 F.3d 901, 907 (8th Cir. 2015). While Peterson calls his claim a "retaliation" claim, it appears to be "discrimination" claim. A retaliation claim arises "if an employer takes 'adverse action' against an employee who 'opposes any practice made unlawful under the FMLA—for example, if an employee complains about an employer's refusal to comply with the statutory mandate to permit FMLA leave.'" *Id.* at 909 (quoting *Pulczinski*, 691 F.3d at 1005). By contrast, a discrimination claim arises "'when an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA.'" *Id.* at 908 (quoting *Pulczinski*, 691 F.3d at 1006).

Thus, the only real difference is the nature of the activity that allegedly prompted the adverse action. If the plaintiff simply exercised FMLA rights, and suffered adverse action as a result, the claim is a discrimination claim. If the plaintiff opposed or complained of an employer's unlawful practices under the FMLA, and suffered adverse action as a result, the claim is a retaliation claim. Here, Peterson seems to argue that his protected activity was requesting and taking FMLA leave. Doc. No. 33-8 at 22. Thus, his claim is an FMLA discrimination claim.

Ultimately, the precise label is of little import because both types of claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Brown*, 801 F.3d at 908-09. "To establish a prima facie case of FMLA discrimination, 'an employee must show: (1) that he engaged in activity protected under the Act, (2) that he suffered a materially adverse employment action, and (3) that a causal connection existed between the employee's action and the adverse employment action.'" *Id*. at 908 (quoting *Pulczinski*, 691 F.3d at 1007)). The third element requires proof that the plaintiff's exercise of FMLA rights "played a part" in the employer's decision. *Pulczinski*, 691 F.3d at 1007. If the plaintiff establishes a prima facie case, the employer must articulate a legitimate, non-discriminatory reason for the adverse action and the plaintiff must then

present evidence allowing a finding that this stated reason is mere pretext for discrimination. *Brown*, 801 F.3d at 909; *Pulczinski*, 691 F.3d at 1007.

An employee can establish pretext in various way, including by showing that (1) the proffered reason has no basis in fact, (2) the employee received a favorable review before being fired, (3) that similarly situated employees were treated differently, (4) the employer changed their reason for discharging the employee or (5) the employer deviated from its policies. *Stallings*, 447 F.3d at 1052 (citing *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002)).

### 2.     *Analysis*

Even assuming Peterson can establish a prima facie case of FMLA discrimination, I find (again) that he has failed to present evidence from which the jury could find that the defendants' stated reason for discharge is mere pretext.    The only additional evidence Peterson cites in support of his FMLA discrimination claim relates to Nick Reis, a former Martin employee.    Peterson claims that after Reis returned from FMLA leave, Martin moved him around to various positions and reduced his hours.    Doc. No. 33-2 at 7. Peterson further claims that Reis asked for additional hours but was not given the opportunity to work those hours.    *Id*.    According to Peterson, Reis finally quit because he was not making enough money.    *Id*.    Peterson testified that he heard a discussion between Martin employee Mark Palo and defendant Baldwin in which they stated that they were going to keep Reis in the position with fewer hours until he quit because they did not like him.    Doc. No. 33-5 at 49.

"An employee can prove pretext by showing the employer meted out more lenient treatment to similarly situated employees who were not in the protected class, or as here, who did not engage in protected activity."    *Smith*, 302 F.3d at 835 (citing *Harvey v. Anheuser–Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994)).    Here, Peterson does not

contend that was similarly situated and treated differently. Instead, he argues that the Reis situation demonstrates that Martin had a propensity to discriminate against employees who took FMLA leave. And, indeed, a finding of discrimination against other employees can provide circumstantial evidence to support an inference of discrimination. *See, e.g.*, *Scheidecker v. Avig Enterprises, Inc.*, 122 F. Supp. 2d 1031, 1042 (D. Minn. 2000). Here, however, Peterson's vague and speculative allegations concerning Reis do not come close to establishing discriminatory intent. Even accepting Peterson's testimony about the conversation between Palo and Baldwin as true, which I must do at this stage of this case, it establishes only that they did not like Reis. Peterson does not claim to have heard any discussion as to the reason for their alleged dislike, such as whether it was caused by Reis' exercise of FMLA rights.

The timing of Peterson's discharge similarly fails to create any inference of discriminatory motive. Peterson returned to work after FMLA leave on April 30, 2012, but was not discharged until almost seven months later, on November 19, 2012. "As more time passes between the protected conduct and the retaliatory act, the inference of retaliation becomes weaker and requires stronger alternate evidence of causation." *Tyler v. Univ. of Arkansas Bd. of Trustees*, 628 F.3d 980, 986 (8th Cir. 2011) (citing *Sims v. Sauer–Sundstrand Co.*, 130 F.3d 341, 343 (8th Cir. 1997)). "The inference vanishes altogether when the time gap between the protected activity and the adverse employment action is measured in months." *Id.* (citations omitted). Here, not only did more than six months pass, but two intervening events occurred in the form of Peterson's property damage accidents. I find that the timing of Peterson's discharge does not give rise to an inference of FMLA discrimination.

Ultimately, and for the reasons discussed above as to Peterson's disability discrimination claim, Peterson has failed to produce evidence raising a genuine issue of fact to cast doubt on the defendants' stated reason for his discharge. As such, defendants

are entitled to summary judgment on Peterson's claim that he was discharged due to his exercise of FMLA rights.

## VI.    CONCLUSION

For the reasons set forth herein:

1.    Defendants' motion (Doc. No. 25) for summary judgment is **granted** with regard to all claims.

2.    Judgment shall enter against plaintiff Steven Peterson and in favor of defendants Martin Marietta Materials, Inc., Jeff Baldwin and Stacy Olberding.

3.    The trial of this case, which is currently scheduled to begin June 20, 2016, is **canceled**.

4.    Because this order disposes of all pending claims, this case is **closed**.

**IT IS SO ORDERED.**

**DATED** this 17th day of May, 2016.

_____
LEONARD T. STRAND
UNITED STATES DISTRICT JUDGE